Good morning. You must be Mr. Powers. Yes, I am, Your Honors. Good morning, and may it please the Court. I'm here representing the appellant, Adam Phillippi, who is the plaintiff in the case below. And we're here on review of the district court's grant of summary judgment to the defendant, Stryker Corporation, and we're here on sort of two different issues that are central to the elements of the plaintiff's case. And one is a set of issues related to the liability discussion and another on causation and, in particular, proximate causation. So I want to talk about the liability issues first. And the central problem with the district court's decision in this case is that it imports an overly restrictive, overly narrow standard for what the duty of a manufacturer, particularly a manufacturer of a prescription medical device, it narrows that scope of duty on warnings and providing a safe product so narrowly that it does not comport with California substantively. And so the district court's decision in this case is that it imports an overly restrictive, overly narrow standard for what the duty of a manufacturer, particularly a manufacturer of a prescription medical device, it narrows that scope of duty on warnings and providing a safe product so narrowly that it does not comport with California substantively. And so the district court's decision in this case is that it imports an overly restrictive, overly narrow standard for what the duty of a manufacturer, particularly a manufacturer of a prescription medical device, it narrows that scope of duty on warnings and providing a safe product so narrowly that it does not comport with California substantively. These are red flags that the FDA had considered and rejected an application for a specific use and had done it twice. That the FDA's rejection of that requested indication for use was based on a lack of safety data. That the defendant's own expert is telling the defendant that there might be a problem out here. We're getting reports from the field of a devastating injury, a rare, a heretofore extraordinarily rare injury that now some of the best surgeons in the United States are seeing in alarming numbers. And let me just be sure I understand here. My reading of Valentine is that it doesn't agree with your approach on this thing. Now, as I understand it, under Valentine, your proposed duty to test was specifically rejected and rather specifically rejected the precise duty to test requirement that proposed by your client as being inherently speculative. And do I misread Valentine? You don't – you are not misreading Valentine, Your Honor, but the facts in this case show that this is not a speculative risk. Because we have a defendant here, Stryker, that was getting notice. Well, when did he get the notice? Over a period of time. No, precisely when? The very latest would have been. No, the earliest. Oh, the earliest would have been in two – in the year 2000, when Stryker knew that the FDA had rejected that application because of a lack of safety data and said, if you want to get this indication, you're going to have to do testing. So that's the same. But when did it first hear of incidents where there was a lack of safety – injury resolved? Oh, the injury. I see the issue. So they knew in 2000 that there was no testing and the safety hadn't been tested, but they knew from their own expert consultant in early 2005, Dr. Paulus, and there was an extensive record on what Dr. Paulus told them, their hired medical consultant said, we're seeing these devastating injuries in the field. Is he speaking as of 2005? He says that to them in February of 2005 and tells them that they should be doing testing, they should look into this issue. It's a huge problem. This is six months before the operation. That's correct, Your Honor. Our – Mr. Filippi had the pump implanted in July of 2005, and this discussion with Stryker's own hired medical expert was in February of 2005. Yes. And in that interim, Stryker provided no notice, no warning, not a hint to Dr. – Mr. Filippi's treating physician or to any doctor that there might be a problem. Well, Dr. Paulus told them there had been some unfortunate things coming out from the field, but there wasn't anything direct that they could at that time circulate. At what point did they know enough that they should have sent something out? I will go back to the year 2000, because one of the allegations of a failure to warn here is that when Stryker knew that on two separate occasions the pump that is at issue here had sought clearance from the FDA for use in the shoulder space, which is a new use, back in 2000 the FDA said, no, you can't get that clearance. And the reason the FDA said, no, you can't get that clearance, is that it would be a new use for which there's no safety data. You have an obligation as a manufacturer to make sure that this is going to be a safe and effective product. Stryker knew back in 2000 that the FDA took the position there wasn't sufficient data to support that safe use. I understand that argument. I was just getting to the Dr. Paulus issue. It seems to me six months is a little short to say that because of what Dr. Paulus says, Stryker should at that time have sent out all sort of warning. Just because a doctor says there's a problem out there, they've got to go find the problem. Is there anything else that happens between from Dr. Paulus' indication to Stryker there's a problem out there in the next six months that's in the record, that is prior to the operation? Right. And as I understand the question, there's not anything new beyond what Dr. Paulus told them that Stryker had actual notice of, but what happened in those six months is, and this is a critical issue in this case, in those six months that's when Stryker should have been looking into it rather than simply leaping to the conclusion back in 2005 that there wasn't a problem. And it's that conscious indifference, it's the ostrich sticking its head in the sand that creates liability. Was the problem at that time due to the pump itself or the drugs that were being administered? Well, that is a big fact issue in this case, and that's exactly what Stryker should have been looking into, because they were told by Dr. Paulus sort of a string of three things. They said, here's what the injury seems to be related to. Using the pumps with local anesthetics and epinephrine. Now, what Stryker did is apparently disregard pumps as a cause and then disregard the anesthetic as a cause and simply leapt to the conclusion that it had to be the epinephrine and that as long as they had warned against the use of epinephrine, which they did, they were fine. And they did that warning prior to the operation. That's right. And so what happened is that Stryker, again, on notice that there were at least two other potential causes implicated here, chose not to even look into them. Now, whether that was a good thing to do or whether it was justified or reasonable, that's a question for the jury. Yeah. That's a question for the jury. I know. I thought, and I'm following what Judge Wallace said about the Paulus letter, which I have here as well. But I thought that by the time of your client's surgery that Stryker had already included in its pain pump labeling a warning about the use of epinephrine. That's what I'm saying. They did on the epinephrine, but they did not even look into the other potential issues that Dr. Paulus had raised with them that it might be the pump itself or it might be the anesthetic. Listen to what this letter says. Again, I'm looking at this letter of February the 11th, which I gather is the later letter. And he says, he says, I want to let you know I'm hearing about complications with drip pain pumps. He talks about he's perplexed, thought it could be the heat wand. He says, it now appears the only common thread through all the cases is the marcaine and or lidocaine with the epinephrine solution, which tends to be very acidic and probably the cause. So he's not saying there's something wrong with the pump. He's talking about the epinephrine. And pardon me for saying it wrong. And it sounds like that is exactly what Stryker warned about was that, not the pump, because that's at least at that point what Dr. Paulus was concerned about. Well, Dr. Paulus was concerned about the marcaine and the lidocaine also. And again, that was an issue that Stryker completely glossed over. And that's an issue for a jury to decide whether that was justified based on what Dr. Paulus was concerned about. Now, I'm not saying that Stryker was wrong. I'm saying that Stryker, what was scientifically reasonably knowable at the time, because that's the standard. It's not what was likely to happen, what was absolutely known. The standard under Brown is what they could have known had they bothered to look rather than leaping to the conclusion that was self-serving to exonerate them. But again, I'm sorry. Go ahead. Just what they were doing is you say they were going down the wrong path. But in fact, the unpronounceable drug wasn't used by your doctor, by the doctor, because he already is aware of the problem. And so what they're saying is that as of that time, this was the only information that was out there, and there was no problem because that information hadn't gotten out by the company and the doctor knew about it and didn't use it. No harm, no foul. Isn't that what they're saying? That's what they're saying. And again, I just come back to the issue that under the legal standard and the substantive tort law of California, whether it's strict products liability or negligence, the manufacturer is an expert in the field, has a duty. It's a duty in the law to make the product safe based on what is reasonably scientifically knowable. And there is in the record, there are scientific journal articles that were available, Head Striker bothered to look, and apparently they didn't. But then that gets back to this issue with Valentine and the duty to test, because I don't read the duty to test quite as broadly as you do, as was pointed out. The reality is when they got this letter from Palos, they did send a warning about the use of the unpronounceable drug. It wasn't used. And it seems like the real issue here is what was the causal agent? Was it Dr. Younger? In other words, I think he was a surgeon, right? He was the one that or whoever the surgeon was. That's correct, Your Honor. It was Dr. Younger as the orthopedic surgeon that implanted it. Okay. But the reality is that the claim, as I understand it, is that it was the surgeon's decision to do the operation in a particular way that he learned when he was a resident or intern or something that may have been the problem here and not necessarily the pump. Is that wrong? There's nothing in the record to support a conclusion that there was surgical error. I don't see even allegations that there was surgical error or any problems with his technique. The issue here is, again, for the jury, given the debate on both sides on the causation. It's for the jury if, in fact, there is a duty and there's a question about whether that was complied with. I guess my getting back to the Valentine issue, I'm struggling with the duty, whether, in fact, there was a duty here that rose to the level that you're talking about. It sounds like you're saying there's a freewheeling obligation on the part of Stryker to go out on its own and see every possible problem that could occur. And that's not my understanding of the law. And you're exactly right. That is not the law. And we're not proposing anything that broad. Really where this case comes down is that this duty to test is not an independent duty. It's not a cause of action. It's not a claim. It resembles sort of a specification of negligence. It's a fact issue. Would a reasonable manufacturer under these circumstances, based on what they knew, would a reasonable manufacturer act differently, including test, investigate, review the literature, talk to other doctors, warn, send out letters, put something on their website? A jury would have an opportunity on this fact record to answer all of those questions, but they've been – that's been deprived through the grant of summary judgment. Do you have a question? Can you tell me about Dr. Paulus? Does he work for Stryker or is he independent? He was a – at that time, he was a paid consultant to Stryker. And he was the one that they were relying upon for this area. Now, Dr. Paulus, does the record show specifically what Dr. Paulus recommended to Stryker? The record does. And I don't have the specific – they're in the papers, but he did recommend that they do animal cartilage testing. That would have been pretty quick, pretty inexpensive, and could have been done within that six-month window between the red flag going up in February and Mr. Phillippe's implantation of the pain pump six months later. That was one of the – again, something for the jury to say, would that have been a reasonable thing to do? And I would hold the answer would be yes, to do it quickly. So it would be yes unless it turns out that it has nothing to do with the case and then it turns out to be a no thing. Is there enough evidence to show that Stryker was negligent in relying upon their doctor, their doctor advisor? And secondly, to the extent they didn't follow the advice of Dr. Paulus, is there anything to indicate that was a cause, that they would have found something that would have obviated the injury? I can answer the second question first, and the answer is yes. There is a substantial body of medical evidence right now from bench testing, in vitro, in vivo, retrospective clinical trials, that would indicate that the answer would be yes. They would have identified that, and over time, they finally did, and much later provided warnings. So the answer to the second question is yes, they could have, and it would have made a difference. And identified the cause as what? Well, that's the big debate. That's still going on. It's certainly, and that's where we would have to leap ahead to ultimately the central causation issue here, which in a way isn't really engaged on appeal because, you know, whether it's more likely than not that the continuous infusion of these medications can cause chondrolysis. But again, with respect, this is where I think you're getting ahead of Valentine because you are honestly admitting that this is an area of real controversy. Nobody knows for sure, and yet you're suggesting that by failing to warn about the specifics here, it assumes that Stryker absolutely knew what the problem was and they didn't say anything about it, when in fact you're saying even to this day there's some confusion about it. Well, again, going to the second part there first, today the only confusion I'll just, without sort of going too far, the only confusion is created by defendants who are defending these cases and try to debate causation. The medical community in general recognizes that the continuous infusion of local anesthetics can cause chondrolysis. Any such drug or specific drugs? Local anesthetics. Any local anesthetics? With or without epinephrine, bupivacaine, lidocaine, sensorcaine. And defendants obviously are going to argue that, that we've engaged this issue all over the country for three years now. But medical textbooks recommend against it. Logistical journals recommend against it. And the tragedy is that if Stryker had simply looked into the issue, not as an independent duty to test, but again, to satisfy their obligations under the FDA regulations, under Carlin. Well, the FDA obviously didn't take it at that point. They were not to the point where they felt that something needed to be done, right? You're basing your claim on State law. The FDA did not act at that point, right? Right. The only involvement of the FDA, and it's an important involvement, is that Stryker, again, back in 2000 said, we would like to get a cleared indication to use this in a new way, in a new part of the body. And the FDA said, no. They said it twice, actually. They said, no, you can't do that, because there's not enough safety data to support that indication for use. So they wouldn't bless it, but they didn't say you couldn't do it. Well, no, they did say that you can't do it. They said you cannot put on your label or on your directions. You can't put it on your label. In other words, they weren't blessing it, but neither were they forming an opinion at that point, as I understand it. Either way. The opinion, well, they had a very definite opinion, and it's an important opinion. The opinion of the FDA at that time, in 2000, was there is insufficient safety data to support this use. Right. And so the FDA, it makes no sense. If the FDA says, no, you can't put that on your label, that they would then go out and proactively warn against something they had just told a manufacturer. That's their imprimatur, and that's a little different. You're way over your time. I am. We may give you a minute to respond. Let's hear from your esteemed colleagues on the other side. Okay. Because you are an esteemed colleague, aren't you? Well, Your Honor, I'm humbled by the suggestion, and I appreciate it. I can tell by his wink that you are. I do have to say that I am struck by the ability of the dialogue here to get to the nitty-gritty of the matter. Let's talk about that intervening period, First Judge Wallace, between February of 2005 and June, July, when the surgery happened. What is it that Dr. Paulus is telling me? Dr. Paulus is saying I think it's epinephrine, Your Honor, and that the epinephrine is the problem because it is the acidic quality. Mr. Powers suggests that this is not what Dr. Paulus is saying. And that's from the February 11, 2005 letter. It is, Your Honor. Okay. But what the construction that the appellate puts on this e-mail is that this is an alarm written large about the use of local anesthetics and via continuous infusion. And, in fact, the very testimony that the appellate submitted to Judge Mendez and to the Court in this record at Excerpt Volume 4 at page 538 makes very clear that what Dr. Paulus is talking about is a test limited to epinephrine. And as you pointed out, Judge Wallace, epinephrine is not in the equation when it comes to Adam Filippi's surgery. I mean this cardiac cartilage testing. Yeah. I've got one of those, too. This cartilage testing was to test whether epinephrine was a problem. Exactly. And the reason that we know that is Dr. Paulus has asked during his deposition, would it have increased the price of the animal study you suggested at Medicine Lodge to add a study group for marcaine and lidocaine, the local anesthetics? Dr. Paulus replies, yes. Approximately how much? Perhaps $10,000 or $15,000. So we know from Dr. Paulus's own mouth that what he was proposing in February of 2005, Your Honor, had to do with epinephrine, and we know that the causal connection between the conversation about epinephrine in 2005 and Appellant's surgery is completely severed by the fact that Dr. Younger A. knew about the problem of epinephrine. Because there was a warning from Stryker, right? He got a warning from Stryker in his labeling. He knew about it and didn't use it. Right. But even if there was an alleged deficiency in the epinephrine warning, which of course is not really teed up here, we know that Dr. Younger knew from one source or another, whether it be Stryker or from his work in residency or whatever, he knew not to use epinephrine, and he didn't. So to suggest, if you'll forgive me for being a little flip, that the February 2005 email is a clarion call to arms about local anesthetics and infusion in the joint based upon what Dr. Paulus has heard from unspecified doctors talking about products, the provenance we don't know, is completely irrelevant to the treatment of Mr. Filippi, and we know that there's nothing in this disputed Younger declaration about which so many calisthenics have been done. We know that there's nothing in that declaration that speaks at all to, had I been told again, be really careful about epinephrine, as opposed to just dealing with epinephrine. So that, if you'll forgive me, Your Honor, is, while I think it is the only thing, the only evidence that the appellant has, it's a red herring. And it is important, I think, as the court sees it. You say it's a red herring because there was a warning, it wasn't used, therefore it doesn't have any causation in this issue, in this case, no matter what. Right. Because, Your Honor, the claim is that the continuous infusion of local anesthetics into the shoulder caused the chondrolysis. Right. So that's why it's completely a disconnect. But the warning, if you will, that your esteemed colleague makes, is with respect to the epinephrine, it wasn't used, there was a warning, therefore de minimis non curat lax. If I were sufficiently esteemed to know exactly what that Latin meant, I would say yes. The law does not bother with trifles. Then I agree entirely. How smart my colleague is. Indeed. In fact, I just wrote a brief about some Latin phrase, and I couldn't pronounce it, so I had to look up for the translation called argument from ignorance. And interestingly, it applies in this case to something Mr. Powers was discussing. You're not suggesting that he was saying something ignorant, though. No, I was suggesting that he is guilty of a logical fallacy about the duty, for example, to alert one to whatever the FDA did. I am not satisfied that this record tells you what the motives for the FDA action were in this record. But I do know that the absence of X does not prove the presence of X. That is the argument from ignorance fallacy. This takes care of the Paulus problem. That's the Dr. Paulus problem. But it doesn't take care of the argument that counsel makes that five years before the operation, the FDC, FDIC, you have to do more testing. Well, in fact, Your Honor, there's nothing in the record that the FDA said that. The FDA cleared one particular application for clearance. All right? You can search the record, and I'm struck by the telephone book strategy of opposing summary judgments that I'm sure Your Honors see much more than I. We've got a briefcase, a foot and a half of record, largely completely immaterial. The FDA did not clear the clearance that the FDA gave did not include the synovial cavity indication. This record shows nothing about the intervening regulatory steps about it. There is no statement from the FDA that says you can't do that. And I'm struck when I found out who the panel was that particularly, Your Honor, Judge Smith, you have worked in the 510K fields before and know something about it. For example, the photomedics case. And if the FDA feels that you've got to do something, it's not bashful about telling you so. There isn't any statement from the FDA. I think what I'm struggling with, too, in terms of your learned opponent's situation here, is that the FDA is very, very, very careful about putting its imprimatur on anything. Because, of course, there are preemption issues that flow from that, as well as a sense that it has to comply with the statute. But to refuse to put its imprimatur on a particular procedure or product does not mean you can't do it. It just means you don't have the FDA's imprimatur. Without further testing. Without further testing. Now, sometimes they will say, you know, this is what we found, don't do it. But as I understand it, that's not what happened here. Well, there certainly is no evidence that that happened. It did not happen. And if I don't mean to unnecessarily quibble, but you've made a point that is often lost on the judiciary in these cases. And that is what the FDA is talking about is clearance for marketing purposes. The FDA doesn't practice medicine. It's the doctors who practice medicine. And we know that that's so important in California, because California may, of all the states in the country, be absolutely the leading light on the learned intermediary doctrine. And understanding the sophistication of the doctor and the unique dynamic between the doctor and the patient who knows what the patient requires, and a supplier of either a drug or a medical device, just to use two regulated illustrations, can't possibly pierce through that. And the whole way that our law works recognizes that that's not the case. One final correction on Dr. Paulus. There's nothing in the record that says that Dr. Paulus is Stryker's man on pain pumps. You read that e-mail, Your Honor, and you will see that this is Dr. Paulus fishing for an assignment to do a research study at his medicine lodge or animal lodge, whatever his facility is. There's no evidence that Stryker turned to Dr. Paulus in any context to tell us about what's going on with pain pumps. And the other reason that you know that, Your Honor, is that in the showing about the Stryker follow-up to that, Stryker didn't go back to Dr. Paulus. Stryker went to an anesthesiologist, a prominent anesthesiologist with whom it had a relationship, and said, give us the skinny on this, and did so very quickly. I think they got a response within 15 days that said, I don't know anything about the relationship between local anesthetics and this cartilage condition. An epinephrine can be acidic, and you warn about epinephrine, so I just don't know where this is coming from. Now, there's one point that I think has been overlooked a bit, perhaps, and it's Stryker, my responsibility for it. At root, this is a case that's made up of counsel's argument in terms of trying to raise a tribal issue of fact. And let me give you a couple of illustrations. These articles, the three articles ranging from the 1930s, 1985, and a 2002 article, there's nothing that suggests the significance of those articles to the layperson. And who could have been more eloquent than Judge Kaczynski in Daubert II when he said, look, I'm just a lawyer. I don't ‑‑ I'm not trained in science. I don't know the significance of these. It is inappropriate to call upon counsel to argue what these mean, and it's inappropriate for the court, without the benefit of expert testimony, to conclude what they mean. But when you look at these articles, here's what the articles really say. Dr. Key says you inject rabbit joints a lot with a variety of solutions, none of which include a local anesthetic, by the way. You get inflammation. This, of course, is the beauty of continuous infusion therapy because there's only one insertion into the affected area. Dr. Noll from 1985 says we've looked at this. We see no reason for a contraindication for the injection of local anesthetics, indeed the very local anesthetic used in this surgery, in people. And he says the effect is not, whatever the effect that he observed is not permanent, and he calls the drug benign. And then, I'm sorry, it was a 2004 article, Dr. Petty's article, which is pretty much conceded to be the first report of a case. He doesn't even mention in his discussion the relationship between the fact that a pump was used on one of the three patients and not in the others. And when the seminal work, if you'll forgive me, on this phenomenon in 2007 by Drs. Hansen and Dr. Beck come out, when they discuss, and this is all in the record, but when they discuss the Petty article, they don't even mention the Petty article for doing anything more than reporting and observance rather than drawing any kind of conclusion. So if we go from the dawn of time to the time that Mr. Filippi was operated on, we know by a concession that Mr. Powers made to Judge Mendez during the hearing that no, there is no evidence of chondrolysis associated with continuous infusion by July of 2005. He says that on the record. Is that because the studies before were single injections? There were studies, Your Honor, about continuous infusion. None of the studies that were available on continuous infusion before 2005. I suspect all of us have had a shot of something or other into a joint a time or two, especially if you've been in athletics. But that would be different from this case, I take it, where you have a continuous infusion because there's a pump. Well, there certainly is a difference between a single injection and continuous infusion. However, Your Honor, the studies on the product, including one of the various studies that Mr. Powers cited below, the Barber study, shows that continuous infusion was effective. And another study that is cited by Mr. Powers that postdates the surgery by Dr. Dragoo says, continuous infusion therapy has been successfully used for years. So this is not a circumstance where the product is, as they say, untested and patients were guinea pigs. This was one that was used. There were studies and articles on the use of continuous infusion. Is there relevance as to what is actually used as the drug in these studies as compared with what was used in this case? Well, these studies include all the canes, including bupivacaine, lidocaine. Yes. Now, I see that I only have 20 seconds, and I hope I can do this in 18. You will. You will. Okay. I alerted counsel to this issue before we started this morning. The Court may or may not be aware that yesterday the California Supreme Court handed down an opinion. Good job. You're done. All right. All right. Thank you so much. I appreciate it very much. And we'll turn to your learned opponent. We'll give you one minute to finish up. California Supreme Court what? I don't know. It's a case called O'Neill v. Crane, Your Honor. I'm sorry, Your Honor. I took your comment as recognizing what the opinion was. O'Neill v. Crane is an asbestos case. Yes. And it addresses the issue of the extent to which a manufacturer of pump that has no asbestos affiliated with it, doesn't produce asbestos, doesn't buy asbestos, but the pump is insulated with asbestos. Okay. Could you we'll read the case, but could you give the citation to our clerk and a copy to counsel in case you haven't already done that? I will do for both. Great. Thank you. Thank you, Your Honor. All right. Mr. Pryor, do you want to finish up here in a minute? All right. I'll do my best. I see the time going here. Okay. Counsel makes a really important point about it. It's the doctors who practice medicine and the doctors make decisions. There's a huge responsibility on doctors and these surgeons in particular, and these are the people that need to know information that informs their medical judgment. And as Dr. Younger said in this case, if he had known certain things, if they had been revealed to him by Stryker, things that Stryker knew before July of 2005, he wouldn't have used the pump in Mr. Phillippe and Mr. Phillippe wouldn't have his shoulder completely destroyed for the rest of his life. It's the failure to warn those doctors to enable them to fulfill their duty that creates negligence and strict liability in this case against Stryker. It's also significant that counsel just mentioned the anesthesiologist that Stryker talked to and said, well, I don't really know about the anesthetics in this issue. That's another red flag. When your go-to guy says, gee, I don't know if that might be part of the problem or not, you ought to look into it. So. All right. Thank you both for your argument. This is an interesting case and deals with a complex area, but thank you both. And yes, and thank you for acquainting us with all the problems. No. We're not having shoulder surgery. Okay. The case of. Oh, my. The case of Phillippe v. Stryker is submitted.
judges: Wallace, Noonan, Smith